1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                           WESTERN DISTRICT OF WASHINGTON
7                                     AT SEATTLE

8    RAMON SILVA,

9                              Plaintiff,              Case No. C19-619-RAJ-MLP

10          v.

11   TROY BACON, *et al.*,                             REPORT AND RECOMMENDATION

12                             Defendants.

13

14          **I.    INTRODUCTION AND SUMMARY CONCLUSION**

15          This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Ramon Silva is

16   currently confined at the King County Correctional Facility ("KCCF") in Seattle, Washington.

17   Plaintiff asserts in this action that Defendants violated his rights under the First and Fourteenth

18   Amendments, and under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"),

19   42 U.S.C. § 2000cc, *et seq.*, when they denied him his religious diet and items required by his

20   religion for use during prayer. (Dkt. # 8 at 3-5.) Plaintiff identifies KCCF employees Troy

21   Bacon, Garrett Ferreiro, Todd Clarin, and Dale Porter as Defendants in this action. (*See id.* at 1-

22   2.) Plaintiff seeks injunctive relief and damages. (*Id.* at 7.)

23

REPORT AND RECOMMENDATION - 1

Plaintiff has filed two motions for partial summary judgment (dkt. ## 39, 54) and Defendants have filed their own motion for summary judgment (dkt. # 73). Also pending at this time is Defendants' motion for sanctions. (Dkt. # 81.) The Court, having reviewed Plaintiff's amended complaint, the parties' pending dispositive motions, and the balance of the record, concludes that Plaintiff's motions for partial summary judgment (dkt. ## 39, 54) should be denied, Defendants' motion for summary judgment (dkt. # 73) should be granted with respect to all claims except for those pertaining to Plaintiff's request for scented prayer oil. The Court further concludes that Plaintiff's amended complaint (dkt. # 8) and this action should be dismissed with prejudice as to all claims except those pertaining to Plaintiff's request for scented prayer oil. Finally, this Court concludes that Defendants' motion for sanctions (dkt. # 81) should be denied.

## II.  BACKGROUND

On November 9, 2018, Plaintiff was sentenced in King County Superior Court to a term of 84 months confinement in the Washington Department of Corrections ("DOC") for a domestic violence related assault conviction. (*See* Dkt. # 68, Ex. D at 3.) On November 16, 2018, Plaintiff was transferred from KCCF into the custody of the DOC to begin serving his sentence for that conviction. (*Id*., Ex. D at 8.) On November 8, 2018, the day before he was sentenced, Plaintiff was confined in the restrictive housing unit at KCCF when he threw a liquid "slurry" out of the pass-through port of his cell striking a KCCF corrections officer on his face and uniform. (*Id*., Ex. D at 7.) Plaintiff apparently had the slurry stored in a plastic cleaning bottle which he then used to project the liquid. (*Id*.) Plaintiff threatened to throw the remaining slurry, a mixture of feces and urine, on any responding corrections officers. (*Id*.) Plaintiff was subsequently charged

REPORT AND RECOMMENDATION - 2

in King County Superior Court with custodial assault based on the events of November 8, 2018. (*Id.*, Ex. D. at 1.)

Plaintiff was returned to King County from the DOC to face the custodial assault charge and he was booked back into KCCF on February 15, 2019. (Dkt. # 74, ¶ 12.) The February 2019 booking was Plaintiff's eighth booking at KCCF since 2008.[1] (*Id.*, ¶ 11.) Plaintiff was placed in restrictive housing at the time of his most recent booking because of his history of custodial assaults and other aggressive behaviors. (*Id.*, ¶ 13.)

Following his return to KCCF, Plaintiff began requesting accommodations for a religion he created in December 2018 while he was in DOC custody that he calls "The Keepers of the Light." (*See* Dkt. # 4 at 6; Dkt. # 74, Ex. H.) Specifically at issue in this case are Plaintiff's request for a diet that satisfies the requirements of his religion (*see* dkt. # 8 at 3-4), and items Plaintiff claims are required by his religion for use during prayer including scented oils, music, and marijuana (*see id.* at 4-7.)

Plaintiff submitted with his original complaint in this action a copy of his religion's sacred/holy book which he refers to as "The Guide Light." (*See* Dkt. # 4 at 7; Dkt. # 4-1.) That document, which was written by Plaintiff, details the tenets and requirements of his religion. (*See* Dkt. # 4-1.) The document sets forth the requirements for "The Keeper Diet," including the specific times during the day when meals must be consumed (12 p.m., 3 p.m., 6 p.m., and 9

---

[1] Since his return to KCCF, Plaintiff has accumulated additional charges based on assaultive behavior directed towards corrections staff. On July 16, 2019, Plaintiff spit in the face and mouth of a corrections sergeant and stabbed a corrections officer in the head and cheek with a sharpened pencil, coming within two inches of the officer's eye. (Dkt. # 68, Ex. E.) Plaintiff was charged with custodial assault and assault in the second degree as a result of that conduct. (*See id.*) Plaintiff was subsequently charged in a third case for an alleged custodial assault that occurred on July 20, 2019. (*See* Dkt. # 82, ¶ 4.) All of these charges are currently pending against Plaintiff in King County Superior Court.

REPORT AND RECOMMENDATION - 3

p.m.), and the rituals that must be observed by adherents ("Keepers") while preparing and consuming meals. (*Id*. at 18-22.) For example, according to The Guide Light, all animal and plant "beings" are to be thanked and blessed by Keepers prior to cooking (*id*. at 19-20), all cooking is to be done by Keepers (*id*. at 19), all meals are to be consumed with music and the "sacred plant," *i.e.,* marijuana (*id*. at 19-20), all meals are to be consumed "in the homes away from strangers" (*id*. at 21), and all Keepers are to "fill themselves untill [sic] they are content" (*id*.).

The Guide Light also details which foods must be consumed or avoided. (*See id*. at 19-20.) In particular, all animals, plants, fruits, and vegetables must be chemical free, toxin free, and open range with no growth hormones, pesticides, or inhumane practices (*id*. at 19), all Keepers are to abstain from eating gluten, gelatin, soybeans, and genetically modified foods (*id*.), all Keepers are to eat animal meat three times each day which is "hot, moist, flavorful," on the bone, and properly seasoned (*id* at 19-20), the meat at one meal each day is to be spiced with chili peppers (*id*. at 20), fresh, cold milk is to be consumed with all meals (*id*.), fresh chicken eggs are to be consumed hot with the first meal of each day though never in the same style as the preceding day (*id*.), and, all water consumed and used in preparation of meals is to be fluoride free in order to protect the pineal gland from calcification (*id*. at 21). The Guide Light identifies as well acceptable sources from which food may be acquired. (*Id*.) Specifically, all "foods and products" are to be supplied by Keepers, preferably local ones. (*Id*.)

The Guide Light sets out additional requirements for the "sacred feast" which is to occur six times per year on specified dates and is to include T-bone steaks, ribs, pork chops, salmon, corn on the cob, baked beans, potato salad, and deviled eggs, among other foods. (*Id*. at 35-36.) The feast is to commence at midnight on the designated days and to last for 24 hours. (*Id*. at 36.)

REPORT AND RECOMMENDATION - 4

In addition to the various dietary requirements, The Guide Light also sets forth requirements governing prayer. In particular, Keepers are to pray four times each day prior to meals and they are to use scented oils, music, and the sacred plant during prayer.[2] (*Id*. at 14.)

In March and early April 2019, plaintiff submitted a total of eighteen grievances to KCCF officials related to his religious beliefs. (*See* Dkt. # 74, Ex. J.) Among Plaintiff's requests were that he be provided animal meat at all meals which could only be consumed "off the bone," a radio, headphones, fluouride-free water, incense, fragranced oils, marijuana, and chili peppers. (*See id*.) On April 26, 2019, KCCF Sergeant Ferreiro sent Plaintiff a memorandum advising him that all of these requests were denied "based on a compelling government interest in order and security."[3] (*Id*.)

On April 12, 2019, Plaintiff submitted a service request kite to Inmate Management and Services ("IMS") requesting that he be provided "a non gluten, non gelitin [sic], non soybean, meat on the bone diet in accordance with my religion." (*Id*., Ex. I at 1.) Though Plaintiff apparently sent his religious diet request to the proper department within KCCF in accordance with the instructions set forth in the Inmate Information Handbook (*see id*., Ex. A at 25), the kitchen staff rather than the IMS staff responded to the request (*see id*., Ex. I at 1.) The kitchen staff advised Plaintiff that they did not offer a religious diet for what he was requesting and

---

[2] The Guide Light also mandates that a "sacred purge" occur every December 31st during which only "sacred tea and fruits from foreign lands" are to be consumed (dkt. # 4-1 at 23), and that a "sacred gathering" occur every July 1st at the Space Needle in Seattle (*id*. at 30). Keepers are prohibited from having blood drawn or from receiving injections. (*Id*. at 24.) Keepers are also required to care for an animal (*id*. at 15), take a hot bath and soak their feet once each week (*id*. at 25-26), maintain proper dental hygiene (*id*. at 25), and wear comfortable and stylish footwear (*id*. at 26).

[3] Plaintiff had also requested to speak with a religious volunteer. (*See* Dkt. # 74, Ex. J.) Plaintiff was advised that he was not being prohibited from seeing a religious volunteer of his faith, there were simply no volunteers at that time adhering to either the Keepers of the Light or Luciferianism. (*Id*.)

REPORT AND RECOMMENDATION - 5

1    explained that they offered halal and kosher diets and were required to follow those menus. (*Id*.)

2    Plaintiff was directed to kite IMS for a regular religious diet. (*Id*.) Plaintiff was also advised that

3    in order to obtain a non-gluten, non-soybean diet he would have to kite medical. (*Id*.)

4        On October 1, 2019, plaintiff submitted a service request kite to the Chaplain/Religious

5    Services department requesting that arrangements be made for his "sacred feast" which was to

6    take place on October 30th and had to include "music, dancing, the sacred plant, certain foods."

7    (*Id*., Ex. I at 2.) Once again, the kitchen staff responded to the kite and advised Plaintiff that the

8    only religious holiday feasts offered at KCCF were Christmas Day, Ramadan, and Passover. (*Id*.)

9        On October 8, 2019, Plaintiff submitted another service request kite to IMS relating to his

10    religious diet. (*Id*., Ex. I at 3.) He requested a "Keeper Diet," as required by his religion, which

11    was to be "non gluten, non gelatin, non soy, non G.M.O., meat 3 meals, meat only on the bone,

12    milk at all meals, floride [sic] free water, chicken eggs with first meal and chili peppers." (*Id*.) In

13    response to that request, Plaintiff was advised that KCCF did not offer the diet he was

14    requesting, but that there were alternatives he could consider. (*Id*.) Plaintiff was then referred to

15    the section of the Inmate Information Handbook describing available special diets including

16    vegetarian, kosher, and halal diets. (*See id*., and Ex. A at 25.)

17        Plaintiff filed the instant action on April 25, 2019. (*See* Dkt. # 1.) Plaintiff alleged in his

18    original complaint that Defendants had violated his federal constitutional rights and RLUIPA by

19    forcing him to remove his religiously mandated head covering and by interfering with his right to

20    petition for redress of grievances. (*See* Dkt. # 4 at 13-15.) Plaintiff subsequently filed an

21    amended complaint in which he attempted to incorporate by reference the claims asserted in his

22    original complaint and he also identified two additional claims pertaining to only one of the four

23    named defendants, Captain Troy Bacon. (Dkt. # 8.) On September 19, 2019, this Court issued a

REPORT AND RECOMMENDATION - 6

Report and Recommendation addressing Plaintiff's motions for preliminary injunctive relief in which it advised Plaintiff that incorporation by reference is not permissible under Local Civil Rule ("LCR") 15, and that if he wished to proceed with respect to all claims asserted in both pleadings, he would have to file a single pleading setting forth all of his intended claims against all intended defendants. (*See* Dkt. # 33 at 2 n.1.) Plaintiff did not file such a pleading and, thus, the two "amended claims" fully set forth in Plaintiff's amended complaint are the only claims properly before the Court. (*See* Dkt. # 8.)

Plaintiff first asserts in his amended complaint that defendant Bacon violated his First and Fourteenth Amendment rights and RLUIPA by denying him a diet required by his religion. (Dkt. # 8 at 3.) According to Plaintiff, he spoke with defendant Bacon and wrote numerous grievances concerning his religious diet, and he was told that his requested diet was being denied based on a "compelling government interest in order and security." (*Id.*) Plaintiff claims that other inmates are provided diets required by their religions, but he was denied the diet required by his faith. (*Id.*) Plaintiff further claims that he was served food prohibited by his religion and could not eat it, causing him to lose weight and ultimately forcing him to eat prohibited foods in order to maintain proper nutrition. (*Id.* at 3-4.) Plaintiff asserts that the diet required by his religion is a matter of religious obedience and that meal time is especially sacred to his religion. (*Id.* at 4.)

Plaintiff also asserts in is amended complaint that defendant Bacon violated his First Amendment rights and RLUIPA by denying him access to items required by his religion for use during prayer, including scented oils, music, and "the sacred plant" (a/k/a marijuana). (*Id.* at 4-5.) Plaintiff claims that the sacred plant is to be used in the manner that works best for the "Keeper" and he indicates that he requested of defendant Bacon that THC pills be provided to

REPORT AND RECOMMENDATION - 7

him by nurses, apparently as a least restrictive means of accommodating this need. (*Id.* at 6.)

Plaintiff also indicates that he requested wireless headphones with a built in AM/FM radio to

provide the requisite music, and scented oils. (*See id.* at 6-7.)

As noted above, Plaintiff has filed two motions for partial summary judgment. (Dkt. ##

39, 54.) In the first of his two motions, Plaintiff seeks summary judgment on his RLUIPA claim

pertaining to the denial of his religious dietary requests and the denial of his request for scented

oils. (Dkt. # 39.) In his second motion, Plaintiff appears to seek summary judgment on his

RLUIPA claim pertaining to the denial of his request for marijuana. (Dkt. # 54.) Defendants

appear to seek summary judgment with respect to all of Plaintiff's claims. (*See* Dkt. # 73.) The

parties' dispositive motions are now ripe for review.

### III.    DISCUSSION

**A.    Applicable Standards**

*1.    Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party

fails to make a sufficient showing on an essential element of his case with respect to which he

has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving

party bears the initial burden of showing the district court "that there is an absence of evidence to

support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by

producing affirmative evidence that negates an essential element of the nonmovant's case, or by

establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of

persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102

REPORT AND RECOMMENDATION - 8

(9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

REPORT AND RECOMMENDATION - 9

2.    *Section 1983 Standard*

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that

he suffered a violation of rights protected by the Constitution or created by federal statute, and

(ii) that the violation was proximately caused by a person acting under color of state law. *See*

*Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is

satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

another's affirmative act, or omitted to perform an act which he was legally required to do that

caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

(citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

**B.    Analysis**

1.    *Personal Participation*

The Court first addresses Defendants' argument, as set forth in their motion for summary

judgment, that Plaintiff's constitutional claims against Defendants Garrett Ferreiro, Todd Clarin,

and Dave Porter should be dismissed for failure to state a claim. (Dkt. # 73 at 5.) Defendants

argue that Plaintiff's amended complaint is devoid of any specific factual allegations showing

that these three Defendants personally participated in the deprivation of any of Plaintiff's

constitutionally protected rights, and that Plaintiff's § 1983 claims against these Defendants

should therefore be dismissed. (*Id*. at 5-6.) Plaintiff does not oppose the request to dismiss these

Defendants and, indeed, Plaintiff's amended complaint does not assert any claims against

Defendants Ferriro, Clarin, or Porter. Accordingly, these three Defendants should be dismissed

from this action.

REPORT AND RECOMMENDATION - 10

2.    *Sincerity of Religious Beliefs*

A key component of religious claims brought under both the First Amendment and RLUIPA is the sincerity of the claimant's religious beliefs. In order for a religious claim to merit protection under the First Amendment, "the claimant's proffered belief must be sincerely held; the First Amendment does not extend to 'so-called religions which ... are obviously shams and absurdities and whose members are patently devoid of religious sincerity.'" *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (quoting *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir.1981)). Likewise, under RLUIPA, "a prisoner's request for an accommodation of a religious practice must be sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015). The United States Supreme Court has explained that the question of sincerity is a question of fact. *United States v. Seeger*, 380 U.S. 163, 185, (1965).

Defendants argue in their motion for summary judgment that Plaintiff's free exercise and RLUIPA claims should be dismissed for lack of sincerity. (Dkt. # 73 at 13-14.) Defendants ask the Court to infer a lack of sincerity from the facts that Plaintiff only recently founded the religion and is the sole member, and that Plaintiff wrote the religious materials himself and pronounced the tenets of his belief system. (*Id.*) Plaintiff responds that his religious beliefs are indeed sincere (*see* dkt. # 83 at 1), and he has submitted a declaration attesting to the sincerity of his beliefs and to the importance of the religion in his life (*id.*, Ex. 1). Plaintiff argues that the dispute regarding the sincerity of his beliefs is a dispute of material fact which precludes summary judgment. (*Id.*)

The evidence in the record demonstrates that Plaintiff created the religion he espouses shortly after entering DOC custody where he was facing a seven-year term of confinement on an assault conviction. (*See* Dkt. # 68, Ex. D at 3; Dkt. # 74, Ex. H.) As a result of subsequent

REPORT AND RECOMMENDATION - 11

assaults allegedly committed while in KCCF custody, it appears that Plaintiff is now facing a life sentence under the Washington Persistent Offender Statute. (*See* Dkt. # 69, Ex. E at 3-5.) The requirements of Plaintiff's religion, as set forth in The Guide Light, are largely incompatible with prison life, including a significant emphasis on the use of marijuana, an onerous daily diet regimen, and an elaborate "sacred feast" which mandates items many non-prisoners would clamor for at a summer barbecue, particularly if offered at government expense. Certainly, the requirements of pet ownership, weekly baths and foot soaks, comfortable and stylish footwear, and annual summer celebrations at the Space Needle are at odds with the lengthy confinement Plaintiff currently faces.

The Court notes as well that Plaintiff's institutional behavior appears to be largely inconsistent with the religion he so recently created. Among the "sacred values" identified in The Guide Light are: (1) "All Keepers will be humble, respectful, honest *and free of evil intentions*;" (2) All Keepers will be *calm*, patient and *in control* and face every challenge with courage learning to navigate this demension [sic] with *calm* and ease;" (3) All Keepers will be true and sincere, careful with every word and *every action committed in harmony with all beings*;" and, (4) All Keepers will learn to master there [sic] emotions and control there [sic] vessels." (Dkt. # 4-1 at 6 (emphasis added).) Certainly, throwing feces and urine at corrections officers and stabbing an officer with a sharp object, as Plaintiff is alleged to have done, are actions contrary to the values Plaintiff claims to adhere to.

It very much appears that to the extent Plaintiff's new-found religion requires accommodations from corrections officials he is quite devoted to its principles, but to the extent it requires modifications of his personal behavior to conform to the stated values of his religion he seems less devout. There are therefore compelling reasons to question the sincerity of

Plaintiff's religious beliefs. However, as noted above, the question of sincerity is a question of fact and there has been almost no factual development surrounding the issue of Plaintiff's sincerity. Defendants apparently made no attempt to depose Plaintiff to learn more about his religion and his beliefs, and their sole reliance on the newness of the religion and the fact that Plaintiff wrote the religious materials and pronounced the tenets of the belief system himself is insufficient to establish an entitlement to judgment as a matter of law on this issue, particularly in light of the evidence submitted by Plaintiff attesting to the sincerity of his beliefs.

The Court also notes that Defendants' request for summary judgment on this issue is an apparent afterthought. The briefing is not well developed and Defendants cite no authority to support the suggestion that because a religion is new, or has few adherents or, indeed, was created by the claimant, the claimant's religious beliefs are necessarily insincere. Moreover, nothing in the record demonstrates that Plaintiff's requests for religious accommodations were actually denied by the KCCF corrections staff based on a lack of sincerity. Rather, it appears the requests were denied based strictly on a compelling government interest. For these reasons, Defendants' motion for summary judgment should be denied with respect to their request for dismissal of Plaintiff's claims for lack of sincerity.

### 3.    *First Amendment*

The Supreme Court has made clear that inmates retain the protections afforded by the First Amendment, "including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). However, the free exercise right "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (citing *O'Lone*, 482 U.S. at 348).

REPORT AND RECOMMENDATION - 13

A person asserting a free exercise claim must show that the government action in question "substantially burdens [the] practice of [his] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). "A substantial burden ... place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013) (quoting *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006)).

In the prison context, even when a prison policy or practice substantially burdens an inmate's religious exercise, it will not violate the First Amendment if the government can demonstrate that the policy or practice "is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 79, 89 (1987). In *Turner*, the Supreme Court held that a prison regulation is valid only if the regulation is "reasonably related" to legitimate penological interests, and it identified four factors for courts to consider in determining reasonableness: (1) the existence of a "valid, rational connection" between the regulation and the legitimate governmental interest put forward to justify it; (2) the existence of an alternative means of exercising the right that remains open to the prisoner; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives that fully accommodate the inmate's rights at a *de minimis* cost to valid penological objectives. *Id*. at 89-91.

Legitimate penological interests include "security, order, and rehabilitation." *Procunier v. Martinez*, 416 U.S. 396, 413 (1974). A reviewing court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to

REPORT AND RECOMMENDATION - 14

1    accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). The burden is not on the state

2    to prove the validity of a challenged regulation but is instead on the inmate to disprove it. *Id.*

3                                    i.    Religious Diet

4           Plaintiff asserts that his religion requires a certain diet and that the diet is a matter of

5    religious obedience. (Dkt. # 8 at 4.) Plaintiff also asserts that he was forced to eat food prohibited

6    by his religion and to significantly alter his religious practice in order to maintain proper

7    nutrition. (*Id.*) These assertions appear to go to the issue of whether the denial of Plaintiff's

8    requested religious diet substantially burdened the practice of his religion. Defendants do not

9    address the question of substantial burden in relation to Plaintiff's First Amendment claim, but

10   they do address the issue in relation to Plaintiff's RLUIPA claim, although not with a great deal

11   of clarity. (*See* Dkt. # 73 at 10.) The Court will incorporate those arguments into its First

12   Amendment analysis.[4]

13          After setting forth the standard that must be met to establish a substantial burden,

14   Defendants assert in a conclusory fashion that Plaintiff has not met his burden because "[t]he

15   evidence reflects that Plaintiff has not been prohibited from exercising his religion, nor forced to

16   make any decision between following his religion or suffering punishment; or a loss of

17   government benefits." (*Id.*) Defendants continue "[t]o the contrary, Mr. Silva was offered

18   alternative means to satisfy his dietary and religious accessory requests." (*Id.*) Defendants then

19   go on to address the origins of Plaintiff's religion, noting that there were no designated

20   requirements for the religion until Plaintiff pronounced them. While Defendants' claim that

21   Plaintiff was offered an alternative means to satisfy his religious diet may be relevant to other

22

23   ---
     [4] The "substantial burden" standard is essentially the same under both the First Amendment and
     RLUIPA.

REPORT AND RECOMMENDATION - 15

parts of the First Amendment and/or RLUIPA analysis, it is inapposite here. If one accepts the proposition that Plaintiff's religious beliefs are sincere, as we must in this instance given Defendants' failure to demonstrate otherwise, the Court must conclude that the denial of Plaintiff's requested religious diet constitutes a substantial burden on his religious exercise.

The Court next turns to the question of whether denying Plaintiff his religious diet is reasonably related to legitimate penological interests. Defendants argue in their motion for summary judgment that they are entitled to judgment as a matter of law with respect to Plaintiff's First Amendment claims related to his requested religious diet because the denial of the requested diet is justified by several legitimate penological interests. (*See* Dkt. # 73 at 8.) Unfortunately, Defendants focus their argument on dietary items that are a part of the "sacred feast" that purportedly takes place six times per year (including T-bone steaks, ribs, pork chops and corn on the cob), and not on the daily religious diet Plaintiff highlighted in his kites. (*See id.*; Dkt. # 74, Ex. I.)

As to the sacred feast items Defendants reference in their motion, Defendants argue that this specialized diet is both cost-prohibitive and poses a substantial risk to the health of Plaintiff, other inmates, and the KCCF staff. (Dkt. # 73 at 8.) Defendants claim that Plaintiff's dietary demands would place a significant financial burden on the DAJD including the "costs of purchase, equipment, preparation, and additional staff." (Dkt. # 73 at 8.) Defendants make no effort to explain with any specificity what these additional costs entail, they note only that the average cost of an inmate's meal is less than a dollar.[5] (*Id.*) The Court can only surmise from

---

[5] Though Defendants do not reference in their summary judgment motion food items that are a part of Plaintiff's daily religious diet, they do reference those items in their response to Plaintiff's first summary judgment motion and argue that those dietary requests are also cost-prohibitive, though once again without any explanation. (*See* Dkt. # 47 at 4.)

REPORT AND RECOMMENDATION - 16

Defendants' motion papers that Plaintiff's religious dietary requirements would raise the cost of his meals to more than a dollar each, though how much more is a mystery that neither party seems inclined to unravel. Plaintiff does not challenge Defendants' claim that his dietary requirements are cost-prohibitive and the Court can well imagine that the costs of accommodating both his highly specialized daily religious diet, and the opulent sacred feast, are significant.

Defendants also argue that the food items requested by Plaintiff as a part of his sacred feast are highly dangerous and pose a safety concern because they can be manipulated into sharp, puncturing instruments that can be used as a weapon and they can also be manipulated for use as a contraband smoking instrument. (Dkt. # 73 at 8; Dkt. # 77, ¶ 7.) Plaintiff does not challenge this claim either and, to the extent Plaintiff seeks to be served meat on the bone multiple times per day as a part of his daily religious diet, the Court can readily conclude that this portion of the requested diet presents safety concerns.

It is Plaintiff's burden, under the First Amendment analysis, to disprove the validity of the challenged restrictions. Though Plaintiff submitted a response opposing Defendants' summary judgment motion, it focuses exclusively on the question of the sincerity of his religious beliefs. (*See* Dkt. # 83.) Plaintiff has offered nothing to rebut Defendants' evidence, scant though it is, that the denial of Plaintiff's religious diet is reasonably related to legitimate penological interests. Defendants are entitled to summary judgment with respect to Plaintiff's First Amendment claim as it pertains to his religious diet.

ii.     Religious Accessories

Plaintiff also claims that he was denied items mandated by his religion for use during prayer, including scented oils, music, and marijuana. (Dkt. # 8 at 4-5.) Plaintiff asserts that

REPORT AND RECOMMENDATION - 17

1    "together these 3 prayer tools are used to raise energy and open up a channel through which our

2    higher being passes in order to enter our vessel and clense [sic] our mind and body of negative

3    energy." (*Id.* at 5.)

4         The Court must first address the substantial burden question in relation to Plaintiff's

5    request for religious accessories. As described above in relation to Plaintiff's First Amendment

6    claim regarding his religious diet, Defendants' argument with regard to the substantial burden

7    issue, as set forth in their motion for summary judgment, is conclusory and largely unhelpful.

8    Defendants also address the issue in their response to Plaintiff's second summary judgment

9    motion which pertains strictly to Plaintiff's RLUIPA regarding the denial of marijuana. (Dkt. #

10   67.) However, they again do so in a largely conclusory fashion:

> 11   Nothing in the record demonstrates that Mr. Silva was compelled to take any action
>      which would be in violation of his beliefs or that Defendants imposed a burdensome
> 12   restriction. Nothing in the record demonstrates that Mr. Silva has a medical
>      necessity or prescription for marijuana or marijuana products. Therefore, Mr. Silva
> 13   fails to meet the first requirement of showing a substantial burden exists.

14   (*Id.* at 3.)

15        Plaintiff asserts that marijuana, and all of his requested religious accessories, are required

16   to be used during prayer. (Dkt. # 8 at 5.) And, indeed, this is one of the requirements set forth in

17   The Guide Light for adherents of the Keeper religion. (*See* Dkt. # 4-1 at 14.) As explained above,

18   if one accepts that Plaintiff's religious beliefs are sincere, as we must in this instance, the Court

19   must necessarily conclude that denying Plaintiff access to religious accessories which are

20   mandated by his religion for use during prayer imposes a substantial burden on Plaintiff's

21   religious exercise.

22        The Court now turns to the question of whether denying Plaintiff his requested religious

23   accessories is reasonably related to legitimate penological interests. Defendants argue that they

REPORT AND RECOMMENDATION - 18

are entitled to judgment as a matter of law with respect to Plaintiff's First Amendment claim relating to his requests for marijuana and headphones. (Dkt. # 73 at 8-9.) Defendants do not specifically address Plaintiff's request for scented oils in the First Amendment context. (*See id.*)

With respect to Plaintiff's request for marijuana, Defendants appear to argue that because it is a controlled substance, it constitutes contraband and therefore allowing it inside the facility would be disruptive to the orderly operations and security of the facility. (Dkt. # 73 at 8-9.) With respect to Plaintiff's request for headphones, Defendants argue that headphones or earbuds have been allowed only to accommodate hearing impaired inmates in limited areas of the facility, and that Plaintiff's current security level precludes him from possessing such items.[6] (*Id.* at 9.)

Though Defendants make no attempt to explain in any detail the restriction on headphones in their motion, the Court located additional, useful, details regarding the headphone restrictions in Defendant Bacon's answers to Plaintiff's first set of interrogatories which were submitted in conjunction with Defendants' response to Plaintiff's first motion for summary judgment. (*See* Dkt. # 48, Ex. A at 3.) Defendant Bacon explains in his discovery response that "there could be a safety threat with housing individuals with ear coverings where people might not be able [to] hear emergency notifications." (*Id.*) Defendants also explain in their motion that batteries, which would be a necessary component of the wireless headphones requested by Plaintiff, are a controlled item because they can be easily misused to start fires. (*Id.*)

Finally, Defendants argue with respect to both Plaintiff's request for marijuana and his request for headphones that if these requests were granted, other inmates would request similar

---

[6] Defendants state in their motion that Plaintiff has demanded access to remote controls and batteries in addition to headphones. (*See* Dkt. # 73 at 9.) Had Defendants carefully read Plaintiff's amended complaint they would have understood that Plaintiff was simply equating his request for headphones to other items permitted inside the facility.

REPORT AND RECOMMENDATION - 19

accommodations which would create security concerns and be disruptive to the orderly operation of the facility. (*See* Dkt. # 73 at 9.)

As noted above, Plaintiff's response to Defendants' summary judgment motion focuses exclusively on the question of the sincerity of his religious beliefs and does not address any other aspect of his religious claims. (*See* Dkt. # 83.) The Court has no difficulty concluding, based on the record before it, that Defendants have a legitimate penological interest in preventing the introduction of marijuana into KCCF whether it be in plant form or in the form of THC pills, Plaintiff's suggested alternative. Allowing mind-altering substances to potentially circulate in the facility would unquestionably create safety and security issues. According to Dr. Benjamin Sanders, the Medical Director of Jail Health Services ("JHS"), THC is not even allowed into the facility for medical reasons. (*See* Dkt. # 76, ¶ 5) Dr. Sanders states that if an inmate were to arrive at the facility with a prescription or medical necessity for THC, the JHS staff would work to provide an alternative medication that has the same treatment effects rather than provide THC. (*Id.*)

Finally, the Court concurs that granting Plaintiff such a unique accommodation for purposes of his religious exercise would no doubt lead to similar requests from other inmates. Whether such requests were granted or denied, disruptions and security concerns would no doubt arise either because too much of the controlled substance was circulating in the facility or because of resentment over the fact that Plaintiff was accommodated and others were not.

With respect to the requested headphones, the Court is persuaded that Defendants have a legitimate penological interest in restricting Plaintiff's access to headphones given that headphones could prevent Plaintiff, or any prisoner, from being able to hear emergency notifications which could pose a safety threat. In addition, given that batteries would necessarily

REPORT AND RECOMMENDATION - 20

be required to operate the headphones, and given that batteries can be easily misused to start fires (*see* dkt. # 77, ¶ 10), safety and security concerns justify the restrictions imposed on such items. Finally, given that both headphones and batteries are apparently highly controlled within the facility, granting Plaintiff's request for such items would no doubt cause other inmates to request similar accommodations. As noted above with respect to the marijuana, whether other inmates' requests for such items were granted or denied, disruptions and security concerns would no doubt arise either because too many controlled items were circulating in the facility or because of resentment over the fact that Plaintiff was accommodated and others were not.

For the reasons set forth above, this Court recommends that Defendants' summary judgment motion be granted with respect to Plaintiff's First Amendment claims pertaining to his requests for a religious diet, for marijuana, and for headphones as Defendants have adequately demonstrated that the denial of such requests was reasonably related to legitimate penological objectives. The Court expresses no opinion on Plaintiff's First Amendment claim as it pertains to scented oils because neither party has addressed the issue in their motion papers.[7]

### *4.    RLUIPA*

RLUIPA provides broader protections for religious exercise than does the First Amendment. *See Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008). RLUIPA provides in relevant part that "[n]o [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government shows the burden furthers "a compelling governmental interest" and is the "least

---

[7] Plaintiff, in his first motion for summary judgment, seeks summary judgment with respect to his RLUIPA claim relating to scented oils, but Plaintiff does not address his claim in relation to the First Amendment standard.

REPORT AND RECOMMENDATION - 21

restrictive means" of furthering that interest. 42 U.S.C. § 2000cc-1(a); *see also*, *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005). RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see also*, *Cutter*, 544 U.S. at 715.

A plaintiff bears the initial burden under RLUIPA of demonstrating that the challenged regulation imposes a substantial burden on the exercise of his religious beliefs. *See Warsoldier v. Woodford*, 418 F.3d 989, 994-995 (9th Cir. 2005). "[A] burden is substantial under RLUIPA when the state denied [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur*, 514 F.3d at 888 (internal quotes omitted). Once a plaintiff establishes that the challenged state action burdened his religious exercise, the government bears the burden of establishing that the regulation serves a compelling government interest and is the least restrictive means of achieving that interest. *Id*. at 889.

The Supreme Court has acknowledged that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety" and that "maintain[ing] good order, security and discipline, consistent with consideration of costs and limited resources," is a compelling government interest. *Cutter*, 544 U.S. at 722.

i.    Religious Diet

Plaintiff, in the first of his two motions for partial summary judgment, seeks summary judgment with respect to his RLUIPA claim as it relates to his religious diet request. (Dkt. # 39.) Plaintiff asserts that Defendants violated RLUIPA when they failed to consider lesser restrictive measures prior to denying his religious dietary request. (*Id*. at 3.) According to Plaintiff, Defendants have denied ever denying his religious dietary requests, and he argues that

REPORT AND RECOMMENDATION - 22

1    Defendants cannot prove they considered and rejected lesser restrictive means prior to denying

2    his religious dietary requests when they claim they never denied his religious diet request to

3    begin with.[8] (*Id*.)

4         Indeed, Defendants, in their response to Plaintiff's first summary judgment motion, claim

5    Plaintiff did not request a religious diet accommodation from KCCF until well after he filed this

6    action on April 25, 2019, and they appear to argue that this purported fact somehow undermines

7    Plaintiff's RLUIPA claim. (*See* Dkt. # 47 at 3-5.) This argument is frivolous given that the

8    record makes clear Plaintiff filed his first religious diet request on April 11, 2019, in accordance

9    with the rules set forth in the DAJD Inmate Information Handbook, and that the request was

10   apparently mishandled by KCCF staff as it was sent to the kitchen staff for a response rather than

11   to IMS as the policy requires and as Plaintiff specifically requested on the kite form. (*See* Dkt. #

12   74.)

13        Defendants make additional arguments in their responsive brief, including that Plaintiff

14   has not met his burden of demonstrating that the challenged actions impose a substantial burden

15   on the exercise of his religious beliefs. (Dkt. # 47 at 3.) However, that issue was resolved above

16   and need not be revisited. Defendants also argue that Plaintiff's dietary requests, which they

17   acknowledge in this submission include foods which contain no gluten, gelatin, soy, or G.M.O.,

18   meat served on the bone, fluoride free water, and chili peppers, are not only expansive but are

19

20   ─────────────────────

21   [8] Plaintiff attached to his declaration in support of his summary judgment motion a copy of Defendant
     Bacon's responses to some of his discovery requests in which Defendant denies that Plaintiff was denied
     his requested diet for religious reasons and states that the DAJD is permitted to provide religious diet
     accommodations only after an inmate fills out and submits the proper kite. (*See* Dkt. # 40, Ex. A,

22   Requests for Admission ## 11, 13.) The inference from these answers is that Plaintiff never submitted a
     proper request for his religious diet. The discovery responses were dated October 3, 2019. (*See id*., Ex. A

23   at 4.)

also cost-prohibitive and present a security threat to the facility.[9] (*Id.* at 4.) Defendants, however, offer no evidence to support this argument in conjunction with their responsive brief. Defendants direct the Court to Defendant Bacon's answers to Plaintiff's interrogatories which were submitted with their brief, but Defendant Bacon's discovery responses do not in any way address the substance of Plaintiff's dietary request, they focus solely on Plaintiff's purported failure to properly submit a religious dietary request. (*See id*; Dkt. # 48, Ex. B at 7-9.)

Defendants revisit Plaintiff's RLUIPA claim as it relates to his religious dietary requests in their summary judgment motion, arguing that Plaintiff has not met his burden of demonstrating that the DAJD policy that precludes him from having "exorbitant meals" constitutes a substantial burden on his religious exercise. (Dkt. # 73 at 10.) As noted above, this issue has already been resolved. Though Defendants' briefing is somewhat disjointed, they appear to also argue that Plaintiff does not meet the other elements of the RLUIPA standard because he was offered alternatives to his requested religious diet, which he declined to accept, and because Defendants have a compelling government interest in prohibiting access to food which can be used to make sharp objects and in containing costs which they claim would be "exorbitant" if Plaintiff were allowed his requested religious diet. (*Id.* at 11-12.)

Because the Court has concluded that the denial of Plaintiff's requested religious diet constitutes a substantial burden on the practice of his religion, the burden is now on Defendants to establish that this restriction on Plaintiff's religious exercise serves a compelling government interest and is the least restrictive means of achieving that interest. Plaintiff does not challenge

---

[9] Defendants also claim that Plaintiff requests in his amended complaint that he be permitted to prepare his own meals. (Dkt. # 47 at 4.) While The Guide Light does contain such a provision, the Court can find no reference to such a request in Plaintiff's amended pleading (dkt. # 8).

Defendants' assertion that the denial of his religious diet serves the compelling government

interests of security and cost containment. Plaintiff's only argument is that Defendants failed to

consider less restrictive means of achieving these interests before denying his requested diet.

While KCCF staff apparently mishandled Plaintiff's first religious diet request by directing the

request to the wrong department, the response by the kitchen staff did apprise Plaintiff of

available alternative diets and the appropriate mechanism for requesting them. (*See* Dkt. 74, Ex. I

at 1.) Plaintiff's second religious diet request was properly processed through IMS rather than

the kitchen staff, though the response was essentially the same. (*See id.*, Ex. I at 3.) The IMS

staff advised Plaintiff that KCCF did not offer the diet he was requesting and directed him to the

Inmate Information Handbook for alternatives he could consider. (*See id.*)

While RLUIPA requires that an entity refusing an accommodation demonstrate its policy

is the least restrictive means of furthering its alleged compelling interests, prison officials are not

required to refute every conceivable option to satisfy the least restrictive means requirement, nor

are they required to prove that they considered less restrictive alternatives at a particular point in

time, they need only refute alternatives offered by the prisoner. *Holt v. Hobbs*, 574 U.S. 352,

371-72 (2015) (Sotomayor, J., concurring) (citing *United States v. Wilgus*, 638 F.3d 1274, 1289

(10th Cir. 2011)). The record demonstrates that Plaintiff was advised of available alternatives

which he apparently deemed unacceptable, but he apparently never offered any alternatives of

his own. Given how expansive Plaintiff's religious dietary requirements are, it was incumbent

upon him to offer alternatives he deemed acceptable rather than require Defendants to conjure up

and then refute a host of alternative schemes. This Court is satisfied that Defendants considered

the most obvious least restrictive means which were those options available through the DAJD's

existing food service program. They were not required to do more in the absence of any

additional input from Plaintiff. Because Defendants have met their burden under RLUIPA with respect to Plaintiff's requested religious diet, they are entitled to summary judgment with respect to this claim.

ii.    Religious Accessories

Plaintiff also seeks summary judgment with respect to his RLUIPA claims pertaining to the denial of his requests for items he asserts are required by his religion for use during prayer. Specifically, in his first summary judgment motion, Plaintiff argues that he is entitled to judgment as a matter of law with respect to Defendants' denial of his request for scented oils. (Dkt. # 39 at 2.) In his second motion for summary judgment, Plaintiff argues that he is entitled to judgment as a matter of law with respect to Defendants' denial of his request for marijuana. (Dkt. # 54.) Plaintiff argues in both motions that Defendants' failed to consider lesser restrictive means of accommodating his religious needs before denying these requests and that this is dispositive of his claims. (*See* Dkt. ## 39, 54.)

a.    *Scented Oils*

With respect to the scented oils, Plaintiff asserts that his request for scented oils was denied in Sergeant Ferriero's comprehensive response to Plaintiff's many grievances regarding religious items, and that Sergeant Ferriero cited as the basis for the denial compelling government interests in order and security. (*See* Dkt. # 39 at 2; Dkt. # 63, Ex. A.) Plaintiff claims that this somehow proves Defendants did not consider a less restrictive alternative prior to issuing a "blanket ban" on scented oils. (*See id*.)

Defendants, in their response to Plaintiff's first motion for summary judgment, argue that they do not "possess" scented oils or prayer oils, and they challenge Plaintiff's claim that there was a "blanket denial" of his request for such oils on the grounds that Plaintiff fails to put forth

REPORT AND RECOMMENDATION - 26

1    evidence suggesting that there have been prior requests made for oils by other religious

2    denominations. (Dkt. # 47 at 4.) Defendants further argue that "since [Plaintiff] is the only

3    member of his religion that he created while in DOC, there's no evidence that he has ever

4    possessed oils personally, given his continuous custody status." (*Id*.) Finally, Defendants appear

5    to argue that not allowing Plaintiff to possess potentially flammable oils serves the compelling

6    government interest of maintaining security. (*Id*. at 5.)

7         Defendants argue in their own motion for summary judgment that Plaintiff does not

8    assert he attempted to utilize his commissary account to purchase prayer oils and was denied, or

9    that other inmates are permitted to purchase prayer oils to practice their religion. (Dkt. # 73 at

10   11.) Defendants also claim that Plaintiff has not asserted that he has been unable to pray during

11   his detention in the absence of the requested oils. (*Id*.)

12        Defendants arguments are, to say the least, confusing. Defendants argue that they don't

13   possess scented oils, and they apparently base this argument on the fact that the KCCF

14   commissary does not sell such items. (*See* Dkt. # 47 at 4; Dkt. # 48 at 7.) Defendants' evidence

15   establishes that they don't sell such items because such items pose a security hazard. (Dkt. # 48

16   at 7.) Defendants, having established these facts, go on to later argue that Plaintiffs' RLUIPA

17   claim is somehow undermined by the fact that he never attempted to purchase the prayer oils

18   either through the commissary or some other source. (Dkt. # 47.) These arguments simply make

19   no sense and will be disregarded.

20        To the extent Defendants argue that Plaintiff has not provided evidence or argument

21   demonstrating that inmates of other religions have been able to purchase prayer oils (*see* dkt. #

22   47 at 4; dkt. # 73 at 11), this sounds like an equal protection argument rather than a RLUIPA

23   argument and it will therefore be disregarded as well. To the extent Defendants intend to argue

REPORT AND RECOMMENDATION - 27

1    that the denial of prayer oils does not impose a substantial burden on the practice of Plaintiff's

2    religion, Plaintiff has asserted in his sworn complaint that the oils are one of the items mandated

3    by his religion for use during prayer. (Dkt. # 8 at 5.) Defendants have not refuted that claim and

4    any substantial burden argument therefore fails.[10]

5         Defendants do, however, make one useful argument in the RLUIPA context which is that

6    not allowing Plaintiff to possess potentially flammable oils serves the compelling government

7    interest of maintaining security. (Dkt. # 47 at 5.) It strikes the Court that there may be many

8    other compelling reasons not to allow an individual with Plaintiff's institutional history to

9    possess oil of any type, whether it be flammable or not, but Defendants do not make those

10   arguments. Defendants also fail to address in any fashion whether they did, in fact, consider

11   lesser restrictive means before denying Plaintiff's request for scented oil. Plaintiff's own

12   discovery requests appear to suggest a reasonable alternative, *i.e.*, scented lotion which is

13   available at the KCCF commissary, though nothing in the record suggests that either party would

14   have deemed this an acceptable alternative. Given the somewhat limited and confusing briefing

15   on this issue from both parties, this Court concludes that neither Plaintiff nor Defendants have

16   established that they are entitled to judgment as a matter of law with respect to Plaintiff's request

17   for scented oils.

18                              b.    *Marijuana*

19        With respect to his request for marijuana, Plaintiff asserts in his second motion for

20   summary judgment that his religion requires marijuana be used during prayer and that he

21

22   _____

     [10] Because Defendants did not address Plaintiff's First Amendment claim pertaining to the scented oil, the
23   Court did not have occasion to consider earlier whether the denial of the oil imposed a substantial burden
     on Plaintiff's religious exercise.

REPORT AND RECOMMENDATION - 28

requested Defendants permit him to have THC pills, dispensed by nurses, in order to

accommodate this requirement but the request was denied. (Dkt. # 54 at 1-2.) Plaintiff claims

that the denial of the THC pills was made without considering a lesser restrictive means, though

he then goes on to argue that Defendants failed to consider THC as a lesser restrictive means of

accommodating his need for marijuana. (*Id*. at 3.) Plaintiff, in support of this latter argument,

references interrogatories in which he claims he asked Defendants if a lesser restrictive means

had been considered and Defendants merely cited him to the jail policy that prohibits smoking.[11]

(*Id*.)

       Defendants' arguments in opposition to Plaintiff's second summary judgment motion are

somewhat confusing and largely unhelpful. Defendants briefly address the "substantial burden"

issue (dkt. # 67 at 1-2), they argue that not allowing inmates to *smoke* marijuana serves a host of

compelling government interests and is "the least restrictive means for maintaining efficiency"

(*id*. at 4), and they note that Plaintiff has not shown he was ever permitted to possess or consume

marijuana while incarcerated (*id*.). The Court has previously addressed the substantial burden

issue in relation to Plaintiff's request for marijuana and need not do so again here. As for the

remaining arguments, Defendants fail to make clear the connection between not allowing

inmates to smoke marijuana and "maintaining efficiency," and they fail to explain what they

believe to be the relevance of Plaintiff's failure to show he had previously been permitted to use

marijuana while confined. The Court therefore declines to consider these arguments further.

---

[11] Though not entirely clear, the Court presumes Plaintiff is referring to Interrogatory No. 16 in his first set of interrogatories. Plaintiff asked the following question: "Has marijuana or T.H.C. ever been dispensed to inmates by nurses in this jail? Defendant Bacon's response to this question was essentially non-responsive as he cited only to the DAJD policy prohibiting smoking and the use of tobacco. (*See* Dkt. # 48 at 10.)

REPORT AND RECOMMENDATION - 29

The arguments presented by Defendants in their own motion for summary judgment are slightly more coherent. Defendants argue there that the introduction of controlled substances such as marijuana into the facility disrupts institutional order and security, and that policies restricting such substances further the government's compelling interest in the health and safety of all inmates at KCCF. (Dkt. # 73 at 12.) Defendants do appear to mistakenly claim that Plaintiff has not offered "alternative schemes" to KCCF's policies, though they are clearly aware of his request for THC.[12] (*See id*.) They go on to reasonably argue, however, that if Plaintiff's request for marijuana were to be granted other inmates would be motivated to seek similar substances. (*Id*.)

The Court has no difficulty concluding that Defendants have a compelling interest in not allowing a controlled substance such as marijuana into KCCF. It cannot reasonably be disputed that providing marijuana to prisoners is, indeed, likely to be disruptive to the order and security of the facility. To the extent Plaintiff claims that Defendants failed to consider lesser restrictive means before denying his request for marijuana, he undermines this contention by acknowledging that he requested THC as a less restrictive means and that request was also denied.

To the extent Plaintiff simply challenges the denial of this less restrictive means, the compelling government interest in prohibiting THC is no different from the compelling interest the government has in prohibiting marijuana in plant form. Even assuming THC could be dispensed in a controlled fashion by nurses at the facility, supplying mind-altering substances to

---

[12] Defendants assert that Plaintiff has, at best, "inquired why he could not obtain marijuana nurses" (dkt. # 73 at 12) which the Court presumes to be a reference to Plaintiff's suggestion that KCCF nurses provide him THC through the process used to distribute other controlled substances in the facility.

REPORT AND RECOMMENDATION - 30

prisoners in a correctional setting defies reason. As noted above in relation to Plaintiff's First

Amendment claim, the jail will not provide THC to prisoners even in a medical context. The

Court is satisfied that Defendants have met their burden of establishing that denying Plaintiff

access to marijuana or THC serves the compelling government interests of maintaining the

security and orderly operation of the facility by keeping controlled substances out of the facility,

and that restricting access to all mind-altering substances is, in fact, the least restrictive means of

furthering that interest. Accordingly, Plaintiff's motion for summary judgment with respect to his

RLUIPA claim pertaining to the denial of marijuana (dkt. # 54) should be denied and

Defendants' motion for summary judgment with respect to this claim (dkt. # 73) should be

granted.

### 5.    *Equal Protection*

Plaintiff asserts in his amended complaint that the denial of his religious diet also violated

his rights under the Fourteenth Amendment. (Dkt. # 8 at 3.) Though Plaintiff does not assert in

his amended complaint the precise basis of his Fourteenth Amendment claim, the Court can infer

from the pleading that he intends to raise an equal protection claim. (*See id*. at 3-4, ¶¶ 6, 11.) In

particular, Plaintiff asserts that inmates from other religions are provided diets required by their

religions, and he cites as examples Jewish inmates who receive a kosher diet and Muslim

inmates who receive a halal diet. (*See id*.) Plaintiff maintains that despite the jail having

recognized his religion as "sincere," he has been denied the diet required by his faith.[13] (*Id*.)

---

[13] This assertion by Plaintiff regarding the recognition of the sincerity of his religion appears to be based on the fact that when Sergeant Ferreiro denied Plaintiff's multiple grievances related to his religious beliefs in April 2019, he did not reference sincerity in his decision but instead cited compelling government interests. (*See* Dkt. # 30 at 1-2.)

REPORT AND RECOMMENDATION - 31

Defendants move for summary judgment on Plaintiff's Fourteenth Amendment claim though they do not identify equal protection as the underlying basis for the claim and their due process argument is largely incomprehensible. (Dkt. # 73 at 13.) Plaintiff does not address the equal protection issue in any of his submissions aside from his amended complaint. Though neither party has shown much enthusiasm for litigating this particular claim, the Court will address it briefly in order to ensure its ruling addresses all pending issues.

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. The Equal Protection Clause essentially mandates that state and local governments treat alike all persons who are similarly situated. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A viable equal protection claim under § 1983 requires a prisoner "to show that the defendant acted with an intent or purpose to discriminate against the [prisoner] based on membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

In the religious exercise context, "[p]risoners enjoy religious freedom and equal protection of the law subject to restrictions and limitations necessitated by legitimate penological interests." *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (citing *Bell v. Wolfish*, 441 U.S. 520, 545–46 (1979)), *overruled on other grounds by Shakur*, 514 F.3d at 884–85. "[P]rison officials cannot discriminate against particular religions" and "must afford an inmate of a minority religion 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Id*. (quoting *Cruz v. Beto*, 405 U.S. 319, 321–22 (1972) (per curiam)). However, "prisons need not provide identical facilities or personnel to different faiths." *Id*. Rather, prisons "must make 'good faith

REPORT AND RECOMMENDATION - 32

accommodation of the [prisoners'] rights in light of practical considerations.'" *Id.* (quoting *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987)) (alteration in original). In order to succeed on an equal protection claim brought under § 1983, a plaintiff "must show that officials intentionally acted in a discriminatory manner." *Id.* (citing *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir.1991)).

There is simply no evidence before this Court that Defendants acted in an intentionally discriminatory manner in denying Plaintiff his religious diet. The record supports the conclusion that the denial of Plaintiff's requested religious diet was necessitated by legitimate penological concerns and was not motivated by an intent to discriminate against Plaintiff based on his religious affiliation. Plaintiff's equal protection claim therefore fails and should be dismissed.

<u>Motion for Sanctions</u>

After briefing on all of the pending summary judgment motions was completed, Defendants filed with the Court a motion for sanctions under Fed. R. Civ. P. 11 asking that the Court enter an order deeming Plaintiff a vexatious litigant and prohibiting him from filing new pleadings against King County without first obtaining leave from the "presiding judge." (*See* Dkt. # 81) Defendants argue that Plaintiff has demonstrated a pattern of filing pleadings lacking sufficient legal basis for the purposes of annoying, harassing, and causing legal expense to King County and its employees, and they cite to eight lawsuits Plaintiff filed during 2019. (*Id.*) The Court deems the requested order unnecessary.

Pursuant to 28 U.S.C. § 1915A, the Court is required to review "before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). The Court is further required to "dismiss the

REPORT AND RECOMMENDATION - 33

complaint, or any portion of the complaint, if it is: (1) frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). The Court performs this function in *every* prisoner case, including Plaintiff's.

The Court also has another statutory mechanism for dealing with vexatious litigants, 28 U.S.C. § 1915(g). Section 1915(g) provides that a prisoner may not proceed *in forma pauperis* in a civil action "if the prisoner has, on three or more prior occasions . . . brought an action or appeal in a Court of the United States that was dismissed on the grounds that it was frivolous, malicious, or fails to state a claim . . . unless the prisoner is under imminent danger of serious physical injury." Thus, assuming a prisoner files more than three cases which are dismissed pursuant to the screening provisions set forth above, the prisoner's ability to proceed in this Court will be extremely limited. Given that the Court already has mechanisms in place to deal with abusive litigants, Defendants' requested order is both unnecessary and inappropriate.

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that Plaintiff's motions for partial summary judgment (dkt. ## 39, 54) be denied, that Defendants' motion for summary judgment (dkt. # 73) be granted with respect to all claims except for those pertaining to Plaintiff's request for scented prayer oil, and that Plaintiff's amended complaint (dkt. # 8) and this action be dismissed with prejudice as to all claims except those pertaining to Plaintiff's request for scented prayer oil. This Court further recommends that Defendants' motion for sanctions (dkt. # 81) be denied, and that Plaintiff's motion seeking a ruling on his pending dispositive motions (dkt. # 90) be denied as moot. A proposed order accompanies this Report and Recommendation.

REPORT AND RECOMMENDATION - 34

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **June 5, 2020**.

DATED this 12th day of May, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION - 35